**LOCAL 1814, INTERNATIONAL LONG-SHOREMEN'S ASSOCIATION, AFL-CIO, Plaintiff-Appellant,**

v.

**NEW YORK SHIPPING ASSOCIATION, INC., Defendant-Appellee,**

**United STATES of America, Defendant-Intervenor-Appellee.**

No. 1338, Docket 92-6018.

United States Court of Appeals, Second Circuit.

Argued March 16, 1992.

Decided June 1, 1992.

Donato Caruso, New York City (Lambos & Giardino, C. Peter Lambos, New York City, of counsel), for defendant-appellee.

Chad A. Vignola, Asst. U.S. Atty. for the Southern District of New York, New York City (Otto G. Obermaier, U.S. Atty., for the Southern District of New York, Richard W. Mark, Asst. U.S. Atty. for the Southern District of New York, of counsel), for defendant-intervenor-appellee.

Before: MESKILL and PRATT, Circuit Judges, and EUGENE H. NICKERSON, District Judge of the United States District Court for the Eastern District of New York, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

When two federal statutes apply to a situation, but are seemingly incompatible, which one must give way? That is the issue we are faced with on this appeal, which arises from the intersection of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–1968, and the Norris–LaGuardia Act, 29 U.S.C. § 101–115. Plaintiff, Local 1814, International Longshoremen's Association, AFL–CIO ("Local 1814", or "the union") appeals from a judgment of the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge*, which (1) dismissed the union's complaint seeking arbitration under its collective bargaining agreement with defendant New York Shipping Association, Inc. (NYSA), (2) denied the union's request for a "reverse *Boys Markets* injunction", and (3) permanently enjoined "any arbitration involving Local 1814's grievance" that by entering into a proposed consent judgment with the government, NYSA would violate its collective bargaining agreement with Local 1814.

On appeal, Local 1814 contends that the Norris–LaGuardia Act, which divests federal courts of jurisdiction to enter injunctions in all "labor disputes", takes precedence over RICO, a criminal statute that gives district courts civil "jurisdiction to prevent and restrain violations of [the act] by issuing appropriate orders"; thus, the union argues, the district court's injunction was

Ernest L. Mathews, Jr., New York City (Thomas W. Gleason, Kevin Marrinan, New York City, of counsel), for plaintiff-appellant.

in excess of its jurisdiction. We reject the argument and accordingly affirm the judgment of the district court.

### FACTS AND BACKGROUND

Although disposition of this appeal turns on questions of law and involves largely undisputed facts, it is nevertheless necessary to review the events underlying this action in some detail before we can review the decisive legal issues.

#### A. *The government institutes a civil RICO action.*

In an effort to rid the Port of New York and New Jersey (the waterfront) of the influence of organized crime, the government instituted, on February 20, 1990, a civil RICO action (the waterfront case) against numerous defendants. *See* 18 U.S.C. § 1964. The complaint named as defendants purported members of the Genovese and Gambino organized crime families, purported members of the "Westies" organized crime group, six union locals (including Local 1814), two waterfront employers, and two waterfront employers' organizations (including NYSA). The employers and employers' organizations named as defendants were named not as RICO violators, but simply as "Representatives of Employers in Industries Affecting Waterfront Commerce" in order to effectuate complete relief.

The 125–page civil RICO complaint sought extensive equitable relief against the various defendants, not unlike the sweeping reforms sought by the government in the ubiquitous *Teamsters* litigation, which by now is well-chronicled in second circuit caselaw. *See, e.g.,* 905 F.2d 610 (2d Cir.1990); 907 F.2d 277 (2d Cir. 1990); 931 F.2d 177 (2d Cir.1991). More specifically, the government sought in the waterfront case (1) to bar organized crime members and their associates from involvement with the International Longshoremen's Association (ILA), as well as (2) reforms of disciplinary and election procedures within the union locals in order to prevent future influence of organized crime. Four of the six locals have already

entered into consent judgments with the government, each of which has been approved by Judge Sand.

#### B. *A RICO trial takes place.*

Local 1814, along with the remaining defendants in the waterfront case, went to trial. This trial began before Judge Sand on April 15, 1991, and consumed nine weeks over a period of seven months. On December 17, 1991, the day that the defense cases were to begin, Local 1814 and its officers agreed to a proposed consent judgment, which settled the government's claims against Local 1814.

#### C. *Terms of the Local 1814 consent judgment.*

This consent judgment provided for the appointment of a "monitor" to oversee certain operations of Local 1814; it stipulated Local 1814's acknowledgements (1) "that there should be no criminal element or organized crime corruption of any part of the ILA, including Local 1814", (2) that the United States District Court for the Southern District of New York "has jurisdiction over the subject matter of this action", and (3) "that this Consent Decree is a lawful exercise of the Court's jurisdiction"; and further provided for a permanent injunction against racketeering activity by the union and its members, for specific amendments of its constitution and by-laws, and for the resignation of certain high-ranking officials of Local 1814. Judge Sand approved the consent judgment on December 17, 1991.

#### D. *NYSA and the government agree on a proposed consent judgment.*

On November 27, 1991, NYSA and the government also executed a stipulation of settlement in the form of a proposed consent judgment. The pertinent portion reads as follows:

3. *List of Individuals Barred From Waterfront Employment.* At any time after completion of litigation in the District Court in this case, [the government] may provide to NYSA a list, approved by this Court, of individuals prohibited from

seeking, obtaining, or remaining in employment on the Waterfront. The list, if so approved by the Court, may include and identify by name and social security number: (a) any individual defendant herein found to have engaged in a RICO violation in this case; (b) any individual determined by a United States District Court to be a member, as that term is used in the complaint, of any organized crime group, as that term is used in the complaint; or (c) any individual who has aided and abetted (within the meaning of 18 U.S.C. § 2) any individual described in subdivision (a) or (b) of this paragraph in committing a federal felony in the Port of New York and New Jersey.

With respect to subdivisions (b) and (c) of this paragraph, the Government may seek entry of an order in accordance with 18 U.S.C. § 1964(a) and consistent with the terms of this Consent Judgment which shall state the standards and procedures to be utilized in determining whether an individual falls within subdivision (b) or (c) of this paragraph and thus should be prohibited from seeking, obtaining, or remaining in employment on the Waterfront. Plaintiff may apply to the Court to place any individual on the list described in subdivision (b) or (c) of this paragraph by giving notice to that individual, NYSA, and any known employer of said individual. Proceedings to place individuals on the list shall be conducted in accordance with the Federal Rules of Evidence. The prohibition pertaining to any individual shall remain in effect for so long as the authority issuing the prohibition maintains it in effect. This proposed consent judgment contains two other terms relevant to Local 1814's challenge: (1) NYSA "will not knowingly employ in any capacity any individual whose name appears on the list described in paragraph 3 for so long as the Court's injunction against the individual remains in effect"; and (2) the district court shall retain exclusive jurisdiction to enforce the consent judgment "and to conduct any proceedings related thereto."

Judge Sand has not yet approved this consent judgment.

### E. *Local 1814 files a grievance.*

Local 1814 and NYSA, among others, were parties to a collective bargaining agreement which provided, *inter alia,* for arbitration of "[a]ny grievance, dispute, complaint or claim arising out of or relating to" the collective bargaining agreement. Believing that NYSA's consent judgment would (1) create new grounds for discharge not otherwise present in the collective bargaining agreement and (2) make a unilateral change in the terms of the collective bargaining agreement (in violation of a specific portion of the agreement prohibiting such unilateral changes), Local 1814 filed a grievance embodying this claim and seeking to prevent NYSA from entering into the consent judgment. After the labor-management panels charged with reviewing grievances in the first three stages of the grievance machinery (processes provided for in the collective bargaining agreement) all deadlocked, the grievance was referred to the arbitration process, the fourth stage in the collective bargaining agreement's grievance machinery.

### F. *Local 1814 commences the instant action.*

On December 3, 1991, Local 1814 learned that NYSA intended to conclude the consent judgment by reaching an agreement with the government no later than December 14, 1991. Noting that our decisions in *United States v. International Bhd. of Teamsters,* 954 F.2d 801 (2d Cir.1992) (*Star Market*) and *United States v. International Bhd. of Teamsters,* 948 F.2d 98 (2d Cir.1991) (*Yellow Freight*) stand for the proposition that court-ratified consent judgments create rights and duties that are binding on nonparties and that override provisions in a collective bargaining agreement, Local 1814 commenced this action (the arbitration case) on December 4, 1991. The action was assigned to Judge Sand as a related case to the waterfront case.

In its complaint, Local 1814 sought a temporary restraining order, a preliminary injunction, and a permanent injunction against NYSA, all designed to prohibit

NYSA from taking any action "designed to complete and effectuate said consent judgment pending final disposition of this case or a final resolution of the matter through arbitration." Without opposition, the government was permitted to intervene in the arbitration case as a defendant. The application for a temporary restraining order was withdrawn, based upon the joint representation of NYSA and the government that pending an order of the district court they would take no further steps to finalize the consent judgment in the waterfront case. The motion for preliminary relief was set down for argument before Judge Sand on January 9, 1992.

### G. *The government applies for an injunction against arbitration.*

Local 1814 proceeded to move ahead with expedited arbitration. It agreed to one of the four arbitrators proposed by NYSA, and the arbitration was scheduled for December 19, 1991. However, on December 18, the government advised Local 1814's attorneys that it had obtained an *ex parte* temporary restraining order in the arbitration case which "stayed" the arbitration until Judge Sand could rule on the government's motion for a preliminary and permanent injunction of the arbitration.

On December 20, Judge Sand heard argument on the government's "application" to stay the arbitration until the district court could rule on (1) the government's pending motion to dismiss the union's complaint in the arbitration case, and (2) Local 1814's motion to enjoin the parties from completing the settlement and submitting the proposed consent judgment to the court. Local 1814 argued to the district court that such a stay of arbitration would constitute an injunction in violation of §§ 1 and 4 of the Norris–LaGuardia Act, 29 U.S.C. §§ 101, 104, which divest United States courts of "jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute". The government, in turn, argued that an injunction of the arbitration proceeding was necessary under the All Writs Act, 28 U.S.C. § 1651, in order for the district court to

preserve its RICO jurisdiction and its power to approve the proposed consent judgment.

### H. *The district court preliminarily enjoins the arbitration.*

Judge Sand found Local 1814's jurisdictional argument unconvincing. Due to the time constraints inherent in the dispute, he read his decision from the bench. Since this decision is unpublished and not available in any electronic database, and since we recognize that there may well be more litigation in the future concerning the waterfront case, we reproduce the pertinent portions:

The court is of the opinion that it has jurisdiction to entertain this application, and that the temporary relief which the government seeks is * * * carved out by the Norris[–]LaGuardia Act, contrary to the position espoused by counsel for 1814.

Having concluded that the court has jurisdiction, we examine the government's application by the traditional standards which govern consideration of an application for a temporary restraining order which are the same standards as those which govern a preliminary injunction, and the first inquiry is therefore whether the government will suffer irreparable injury.

The court is of the opinion that for these purposes irreparable injury would be sustained by the government. It is clear that the purpose of holding an expedited arbitration, despite the absence of any truly exigent circumstances, and despite the timetable previously established, is to enable Local 1814 and the International to place this dispute in the context of one which an[ ] arbitrable labor dispute has been submitted to an arbitrator so that all of the presumptions and deference normally accorded such an arbitration result will be operative at the time of the January 9 argument.

\* \* \* \* \* \*

Passing the issue of irreparable injury, therefore, we turn to the question of

likelihood of success on the merits. This court, having had but a few hours to address the question, believes that there are very serious questions which go to whether or not there is presently an arbitrable dispute or whether it is premature, and indeed a question whether it will ever be an arbitrable dispute.

\*      \*      \*      \*      \*      \*

It is the contention which Local 1814 and the International wishes to be submitted to the arbitrator that this agreement provides a grounds for termination of employment of members of Local 1814 not contained in the [collective bargaining agreement], and therefore is in violation of the collective bargaining agreement, and that it presents a presently arbitrable grievance.

The court believes that there are significant problems with that claim. The relevant provision of the collective bargaining agreement triggers the grievance and arbitration provisions on the discharge by a member of the NYSA of a member of 1814. Entering into the consent decree or submission of the consent decree for the approval of the court does not [constitute the] discharge of [an] employee. Indeed, it is clear that the consent decree will not impact on any individual member of Local 1814 or result in an order prohibiting his employment on the waterfront until there are significant other proceedings which may or may not \* \* \* take place during the life of the collective bargaining agreement.

First, the government must initiate the proceeding; second, the court must make the determination set forth in the consent decree, and [third,] the court must embody that determination in an order to the NYSA.

Judge Sand further stated that "the law is clear that arbitrability is a question to be determined by the court, not by the arbitrator, and I believe that there are serious questions with respect to whether the agreement is presently arbitrable." Noting that Local 1814 wanted arbitration "so that all of the presumptions and deference normally accorded such an arbitration re-sult" would attach, Judge Sand issued a preliminary injunction against the NYSA–Local 1814 arbitration pending the arguments (scheduled for January 9, 1992) on Local 1814's motion for an injunction against finalization of the consent decree and on the government's cross-motion to dismiss Local 1814's complaint.

I.  *The district court denies Local 1814's motion for an injunction, permanently enjoins arbitration, and dismisses Local 1814's complaint.*

After hearing argument at the January 9, 1992 hearing involving the arbitration case, Judge Sand denied Local 1814's motion for an injunction, granted the government a permanent injunction of the arbitration, and dismissed Local 1814's complaint. Again, since Judge Sand ruled from the bench, we reprint the pertinent parts of his oral opinion:

"[T]he Court has before it two motions.

"One is the application by the government to stay a proposed arbitration between Local 1814 and related unions and the New York Shipping Association.

"The other is the motion by the unions to preclude submission to this Court of the proposed consent decree between the government and the New York Shipping Association.

"That proposed consent decree would contain an agreement by the Shipping Association which would contain, among other things in the agreement, [a term that NYSA would not] continue in employment a member of Local 1814 who was the subject of a court order determining that he was a present member of organized crime.

"Now, the Court first addresses the claim that it lacks subject matter jurisdiction because an injunction would violate the provisions of the Norris–LaGuardia Act.

"The Court rejects that claim, believing that it has jurisdiction not only under the RICO statute but the All Writs Statute, and the inherent power of the court to preserve its jurisdiction.

"This last element is—that is, preservation of the Court's jurisdiction—is really the critical question.

"The relationship between a collective bargaining agreement and a consent decree between an employer and the government is a very delicate matter.

"The question which this Court finds to be the dispositive [one] is not how that relationship should be resolved, but whether consideration should be given by any tribunal to the competing interests espoused by the unions, on behalf of their members in preservation of employment, and that of the government, in rooting out from waterfront employment members who are present members of organized crime.

"This Court has yet to determine whether the proposed consent decree should be signed and will not make that determination until there is a full hearing on the issues presented by that consent decree, including the questions of whether its provisions would constitute an unwarranted, unnecessary, or inappropriate intrusion into the rights of union members, and the further question of whether there would be adequate procedural safeguards, consistent with due process, to protect the rights of individual union members alleged to be presently members of organized crime prior to an order that they no longer be continued in employment.

"Local 1814 and the associated unions have initiated an arbitration alleging that the New York Shipping Association's entry into the consent decree constitutes a present violation of the terms of the Collective Bargaining Agreement, and the question is whether that arbitration should be allowed to proceed and be concluded prior to such time as this Court considers and determines whether or not to approve the consent decree.

"There is considerable reluctance on the part of any court to enjoin an arbitration, and there are many cases that have been and can be cited for that proposition. In the usual context, every presumption is engaged [in] favor of the arbitration.

"That is not the issue presented this afternoon.

"The question which would be before the arbitrator—and which he has assured the parties that he would determine immediately upon completion of their presentation— is the simple issue of whether, looking at the four corners of the Collective Bargaining Agreement, one can say whether it does or does not authorize the discharge of a Local 1814 member because he is presently a member of organized crime.

"Counsel have acknowledged, as indeed the cases compel them to do, that it would be beyond the scope of the arbitrator's reference and authority to consider public-interest questions, to consider the RICO context out of which the proposed consent decree emerges, to consider the record adduced after 42 trial days in this case, in short, to consider anything other than the simple question to which I have made reference.

"It is only this Court that can make that determination. It is not an arbitrable determination.

"The significant issues which will be present when the merits of the consent decree are submitted to the Court are not arbitrable issues, and there is no arbitrable issue raised in the proposed arbitration.

"One might well say, 'Well, then, what difference does it make? Why not let the arbitration go forward because it would be a nullity?' And, indeed, that is a question that is giving the Court some pause, but then one has to ask, 'What is this really all about? Why has there been so much concern on the part of counsel as to the sequence of events?'

"It is clear that the reason why you are all here and why the matter has generated so much paper and discussion and analysis is that the parties, with some foundation in the law—the law which is currently under reexamination by the Second Circuit—attach significance to the sequence of events, and that once an arbitration determination has been made, a claim can be made that it has certain preclusive consequences.

"Because this Court believes that it would be a total distortion of the signifi-

cant issues raised by the proposed consent decree to consider the question whether it would constitute a violation of the Collective Bargaining Agreement apart from the RICO context of this case, and because the Court believes that the Federal District Court is the only tribunal which can engage in the balancing of the respective rights implicated by the consent decree, and believes that it should do so untrammeled by an arbitration decision that would be rendered on an issue which this Court has found to be a nonarbitrable issue, the Court makes permanent the restraint issued on December 20, and enjoins the conduct of the proposed arbitration, and denies the motion by the unions for a reverse *Boys' Market[s]* injunction to enjoin the submission of the proposed consent decree to the Court."

On January 16, 1992, Judge Sand signed the order and judgment granting the government's requested injunction, denying Local 1814's requested injunction, and dismissing Local 1814's complaint. This expedited appeal followed.

## DISCUSSION

On appeal, Local 1814 has abandoned its request for a "reverse *Boys Markets* injunction" and relies on its argument that the Norris–LaGuardia Act, 47 Stat. 70 (1932) (codified at 29 U.S.C. §§ 101–115), strips the district court of jurisdiction to enjoin this labor arbitration. This jurisdictional argument necessarily embraces a number of sub-issues, each of which we address in turn.

### A. *The Norris–LaGuardia Act: an overview.*

In the earliest part of the twentieth century, the injunction was a potent weapon wielded by management against labor groups. To defeat the organizational attempts of labor unions, management frequently charged the labor unions in federal court with conspiracy to violate the Sherman Act, 15 U.S.C. § 1. While congress had in 1914 sought by § 20 of the Clayton Act, 29 U.S.C. § 52, to limit the jurisdiction of federal courts in cases involving labor disputes, the efficacy of that section had

been largely undermined by judicial decisions, *e.g., Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921). *See generally Milk Wagon Drivers' Union, Local 753 v. Lake Valley Farm Products, Inc.,* 311 U.S. 91, 102, 61 S.Ct. 122, 127, 85 L.Ed. 63 (1940). "The result was a large number of sweeping decrees, often issued *ex parte,* drawn on an *ad hoc* basis without regard to any systematic elaboration of national labor policy." *Boys Markets, Inc. v. Retail Clerk's Union, Local 770,* 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970).

In order to "further * * * extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that Act," *New Negro Alliance v. Sanitary Grocery Co.,* 303 U.S. 552, 562, 58 S.Ct. 703, 707, 82 L.Ed. 1012 (1938), congress in 1932 passed the Norris–LaGuardia Act, "to bring some order out of the industrial chaos that had developed and to correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on the behalf of management." *Boys Markets,* 398 U.S. at 251, 90 S.Ct. at 1592. The result was § 1 of the Norris–LaGuardia Act:

No court of the United States * * * shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. §. 101. The "public policy declared in this chapter" is set forth in section 2 of the act, 29 U.S.C. § 102, and is to be used "[i]n the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the United States":

Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and

other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid and protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.

29 U.S.C. § 102.

The Norris–LaGuardia Act is not to "be read in a spirit of mutilating narrowness", *United States v. Hutcheson*, 312 U.S. 219, 235, 61 S.Ct. 463, 467, 85 L.Ed. 788 (1941); rather, it is to be given "a broad interpretation". *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 708, 102 S.Ct. 2672, 2678, 73 L.Ed.2d 327 (1982). *See also Jou–Jou Designs, Inc. v. International Ladies Garment Workers Union*, 643 F.2d 905, 911 (2d Cir.1981). Despite these general principles of broad application, the Supreme Court has recognized that a district court does have jurisdiction to grant injunctive relief under at least two decisional exceptions to the act: (1) when the Norris–LaGuardia Act must be reconciled with the mandates of a specific federal statute, *Boys Markets*, 398 U.S. at 251, 90 S.Ct. at 1592; *Jacksonville Bulk Terminals*, 457 U.S. at 717 n. 17, 102 S.Ct. at 2682 n. 17, and (2) when injunctive relief is necessary to accommodate Norris–LaGuardia's "strong policy favoring arbitration." *Id.* *See Boys Markets*, 398 U.S. at 252–53, 90 S.Ct. at 1593. *Cf. Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S.

397, 412–23, 96 S.Ct. 3141, 3149–55, 49 L.Ed.2d 1022 (1976) (although the issue of whether a strike violated "no-strike clause" in collective bargaining agreement was arbitrable, an injunction of the strike itself not allowed by Norris–LaGuardia).

Local 1814 argues that since this case involves a "labor dispute" as defined in 29 U.S.C. § 113(c), and does not fall within any of the established exceptions to Norris–LaGuardia, Judge Sand acted in excess of his jurisdiction. In rejoinder, both NYSA and the government argue that there is no "labor dispute" here for two reasons. First, the "dispute" will not ripen into an arbitrable "dispute" until Judge Sand signs the consent decree. Second, any "dispute" there might be is not a "labor dispute", but rather a "RICO dispute". Both NYSA and the government additionally argue that RICO serves an important federal policy, to which the Norris–LaGuardia Act and its underlying policies should yield. We address each of these contentions below.

### B. *Is the dispute arbitrable?*

A threshold issue is whether the dispute between Local 1814 and NYSA is arbitrable; if it is not, our inquiry ends, because any injunction that might issue would enjoin an arbitration which need not occur. *See Boys Markets*, 398 U.S. at 247–49, 90 S.Ct. at 1590–91.

The question of arbitrability "is undeniably an issue for judicial determination". *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S.Ct. 909, 912, 11 L.Ed.2d 898 (1964); *Woodcrest Nursing Home v. Local 144, Hotel, Hospital, Nursing Home & Allied Services Union*, 788 F.2d 894, 897 (2d Cir. 1986) (*per curiam* ). Arbitration is a contractual right, and a party cannot be required to submit to arbitration a dispute which is not contemplated as arbitrable by the contract. *AT & T*, 475 U.S. at 648, 106 S.Ct. at 1418; *United Steelworkers of*

*America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir.1980).

■ In deciding the contractual issue of arbitrability, courts must take pains not to rule on the merits of the underlying dispute:

> Whether 'arguable' or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.

*AT & T*, 475 U.S. at 649–50, 106 S.Ct. at 1419. Finally, where the contract contains an arbitration clause, courts should indulge a presumption in favor of arbitrability, which may only be overcome if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 650, 106 S.Ct. at 1419 (quoting *United Steelworkers of America v. Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53) (internal quotations omitted).

The collective bargaining agreement involved here provides for arbitration of "[a]ny grievance, dispute, complaint or claim arising out of or relating to this agreement". Local 1814 asks us to read this provision with breadth enough to encompass its disagreement with NYSA. The government and NYSA maintain that since consent judgments derive their authority from the imprimatur of the court, *see, e.g., Kozlowski v. Coughlin*, 871 F.2d 241, 245 (2d Cir.1989), and since the consent judgment sought here will require additional proceedings and could even be disapproved by the district court, it could not possibly create any conflict with the collective bargaining agreement at least until it is signed. Although the district court did not ground its holding on this issue, it did note the existence of "serious questions with respect to whether the agreement is presently arbitrable".

■ Despite Judge Sand's reservations, we conclude that this dispute is ripe for arbitration under any fair reading of the arbitration clause. NYSA has already agreed to the terms of the consent judgment, and thereby has taken an affirmative step toward becoming bound by a judgment that will require it to do acts which, arguably, would violate the collective bargaining agreement by creating three new grounds for discharge of a union employee—(1) violating RICO, (2) being a member of an organized crime group, or (3) aiding or abetting a person in groups (1) or (2). None of these three grounds is mentioned in the collective bargaining agreement.

A contracting party has the right to expect that the other party will do nothing substantially to impair the expectation of performance, *see, e.g., Equitable Trust Co. v. Western Pac. Ry.*, 244 F. 485, 502 (S.D.N.Y.1917) (L. Hand, J.), *aff'd*, 250 F. 327 (2d Cir.), *cert. denied*, 246 U.S. 672, 38 S.Ct. 423, 62 L.Ed. 932 (1918); *cf.* U.C.C. §§ 2–610, 2–611, and the settlement which NYSA has entered into with the government might have the effect of impairing NYSA's performance. Such an "anticipatory breach" (or, rather, breach by anticipatory repudiation) of a collective bargaining agreement would undoubtedly be ripe for judicial decision in a garden-variety breach of contract case. Taking into account the presumption in favor of arbitrability, we conclude that this contractual dispute, although by no means "garden variety", is a "grievance, dispute, complaint, or claim arising out of or relating to" the collective bargaining agreement between Local 1814 and NYSA.

While the government and NYSA both cite cases holding disputes "unripe" for arbitration, each case is readily distinguishable on its facts. In *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 860 F.2d 1420 (1988), the seventh circuit was called upon to interpret a clause requiring arbitration of "controversies" and "disagreements" over the proper interpretation and application of the contract, *id.* at 1425, and to apply that clause to the union's complaint that it had "reason to believe" the newspaper had interpreted a term in the collective bargaining agree-

ment in a fashion contrary to that espoused by the union. *Id.* at 1422.

The ninth circuit, in *Alpha Beta Co. v. Retail Store Employees Union, Local 428,* 671 F.2d 1247 (1982), also cited by the government and NYSA, was faced with a similar challenge. There, the union and the employer had entered into a settlement agreement regarding the proper interpretation of a clause in their contract. The settlement agreement itself, however, did not have an arbitration provision. The ninth circuit concluded that the "dispute" involved an interpretation of the settlement agreement, *i.e.,* an interpretation of the interpretation; thus, there was no dispute "involving or arising out of the meaning, interpretation, application or alleged violation of" the *contract,* and thus nothing in the contract to arbitrate. *Id.* at 1250.

In contrast to *Chicago Typographical Union,* Local 1814 has much more than "reason to believe" that NYSA will enter into a consent judgment embracing certain terms; indeed, NYSA has gone as far as it can by agreeing to the proposed terms of the consent judgment. And, in contrast to *Alpha Beta,* the contract which is alleged to have been breached here *does* contain an arbitration provision—an extremely broad provision, at that. We thus conclude that the dispute between NYSA and Local 1814 is arbitrable. We next consider the specific provisions of the Norris–LaGuardia Act.

### C. *Is this a "labor dispute"?*

Does this dispute fall within the meaning of "labor dispute" under Norris–LaGuardia? This issue, too, is potentially dispositive of Local 1814's challenge. We start with the words of § 13 of the Norris–La-Guardia Act:

(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers and associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

(c) The term "labor dispute" includes any controversy concerning terms and conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(a)–(c).

■ Local 1814 argues that its dispute with NYSA is a "controversy concerning terms and conditions of employment" since the consent judgment, if approved, will alter the provisions of the collective bargaining agreement relating to, *inter alia,* discharge. NYSA, bootstrapping onto its arbitrability argument, attacks Local 1814's contention by arguing that since no ripe "dispute" exists for arbitration, no "labor *dispute*" exists for purposes of the Norris–LaGuardia Act. Since we have already determined that a ripe "dispute" under general principles of arbitrability does in fact

exist, this major premise of NYSA's argument falls by the wayside.

The government, however, offers a different, largely semantic, analysis in support of the same conclusion. As intervenor-defendant, the government sees this case not as a *"labor* dispute", but as a *"RICO* dispute" to which the Norris–LaGuardia Act simply does not apply. The fundamental flaw with this argument, of course, is that many "RICO disputes" are also "labor disputes"—the categories are not mutually exclusive. We thus conclude that, on its face, the dispute between Local 1814 and NYSA falls within Norris–LaGuardia's definition of "labor dispute", as it involves "terms and conditions of employment".

**1. "Labor dispute": the plain meaning.**

The term "labor dispute" has a "broad meaning under the Norris–LaGuardia Act". *Corporate Printing Co. v. New York Typographical Union No. 6*, 555 F.2d 18, 21 (2d Cir.1977). *See Jacksonville Bulk Terminals*, 457 U.S. at 711, 102 S.Ct. at 2679 ("The Act merely requires that the case involve 'any' labor dispute."). Critical to whether a dispute is a "labor dispute" is whether "the employer-employee relationship [is] the matrix of the controversy." *Columbia River Packers Ass'n, Inc. v. Hinton*, 315 U.S. 143, 147, 62 S.Ct. 520, 522, 86 L.Ed. 750 (1942).

In the Norris–LaGuardia Act, congress defined "labor dispute" in terms that "no longer leave room for doubt." *United States v. Hutcheson*, 312 U.S. at 234, 61 S.Ct. at 467. Section 13 of Norris–LaGuardia was obviously written with bipolar (*i.e.,* employee-employer, employer-employer, and employee-employee) disputes in mind. *See* 29 U.S.C. § 113(a)(1)–(3). What we are presented with, however, is fairly characterized not as a bipolar, but as a triangular dispute, with a group of employees (Local 1814), a group of employers (NYSA), and the government at the respective corners of the triangle. While the government urges that, in order to determine the nature of the dispute at issue, we should look only at one leg of the triangle, the one

representing the RICO–born "dispute" between NYSA and the government, we cannot ignore the fact that this case focuses also upon another leg of that triangle, *i.e.,* the one representing the contractual dispute between Local 1814 and NYSA.

As we have noted above, Local 1814's complaint alleges an anticipatory breach of the collective bargaining agreement between Local 1814 and NYSA; this is surely a "controversy concerning terms and conditions of employment," 29 U.S.C. § 113(c), in which "the employer-employee relationship is the matrix" of the dispute. *See Jacksonville Bulk Terminals*, 457 U.S. at 713, 102 S.Ct. at 2680; *Columbia River Packers*, 315 U.S. at 147, 62 S.Ct. at 522. The government's intervention does not, by itself, alter the essential character of this dispute, which is between an employers' group and an employees' group, *see* 29 U.S.C. § 113(a)(1) ("between one or more employers or associations of employers and one or more employees or associations of employees"), over the proper interpretation of their collective bargaining agreement.

Our reading hews close to recent Supreme Court decisions that command strict adherence to the literal definition of "labor dispute". *See Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 441–42, 107 S.Ct. 1841, 1848–49, 95 L.Ed.2d 381 (1987); *Jacksonville Bulk Terminals*, 457 U.S. at 712–13, 102 S.Ct. at 2680. Although departures from strict adherence to statutory language are justified in "rare and exceptional circumstances", *see, e.g., Tennessee Valley Authority v. Hill*, 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930)), normally for this court to narrow the statutory definition of "labor dispute" would run contrary to congress's, as well as the Supreme Court's, commands. *See Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960). We thus conclude that the instant controversy falls within the class of cases defined by congress as "labor disputes" under the Norris–LaGuardia Act, since it concerns "terms and conditions

of employment". 29 U.S.C. § 113(c). We next consider whether this labor dispute falls into one of the established decisional exceptions to the act.

2. "Labor dispute": the decisional exceptions.

■ As we have noted above, the Supreme Court has recognized two narrow decisional exceptions to the jurisdiction-stripping provisions of the Norris–LaGuardia Act. First, the federal courts have jurisdiction to issue injunctions in "labor disputes" when necessary to accommodate Norris–LaGuardia's "strong policy favoring arbitration". *Jacksonville Bulk Terminals*, 457 U.S. at 717 n. 17, 102 S.Ct. at 2682 n. 17; *Boys Markets*, 398 U.S. at 252–53, 90 S.Ct. at 1593. Second, the federal courts have such equity jurisdiction when necessary to reconcile Norris–LaGuardia with the mandates of a specific federal statute. *Jacksonville Bulk Terminals*, 457 U.S. at 717 n. 17, 102 S.Ct. at 2682 n. 17; *National Ass'n of Letter Carriers v. Sombrotto*, 449 F.2d 915, 919 (2d Cir.1971) (Friendly, J.).

■ As an initial matter, it is noteworthy that Local 1814 commenced this case seeking a "reverse *Boys Markets* injunction"— *i.e.*, an injunction designed to further the Norris–LaGuardia Act's strong policies favoring arbitration, *see, e.g., Niagara Hooker Employees Union v. Occidental Chem. Corp.*, 935 F.2d 1370, 1376–77 (2d Cir. 1991)—against NYSA, to keep it from undertaking further steps toward finalizing the consent judgment. However, the district court not only denied Local 1814 this relief; it also concluded that it had jurisdiction under the RICO statute (utilizing its concomitant powers to preserve its jurisdiction under the All Writs Act) to enjoin the arbitration because RICO—a specific federal statute designed to further an overriding congressional concern—falls within the second decisional exception "carved out" of the Norris–LaGuardia Act. Although Local 1814 has abandoned, on appeal, its request for a "reverse *Boys Markets* injunction", it nevertheless argues that in the circumstances presented by this case, only

an injunction favoring arbitration, and not an injunction against arbitration, would properly be within the district court's jurisdiction. *See* Local 1814 brief at 18 (citing *Camping Const. Co. v. District Council of Iron Workers*, 915 F.2d 1333, 1348 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1684, 114 L.Ed.2d 79 (1991); *In re Dist. No. 1—Pacific Coast Dist., Marine Engineers' Beneficial Ass'n*, 723 F.2d 70, 77–78 (D.C.Cir.1983); and *Jou–Jou Designs*, 643 F.2d at 911).

To properly address Local 1814's argument, we turn to the history of RICO, as well as to the statute itself. To begin with, Local 1814 ignores the important interrelationship between RICO and labor activities. RICO, which was adopted in 1970 (38 years after Norris–LaGuardia), establishes a strong congressional policy of purging society of the menace of organized crime. Indeed, the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922 (Title IX of which is RICO, codified at 18 U.S.C. § 1961 *et seq.*), states the congressional finding that organized crime's "money and power are increasingly used to infiltrate and corrupt legitimate business *and labor unions* and to subvert and corrupt our democratic processes" (emphasis added); congress intended to eradicate organized crime "by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions *and new remedies* to deal with the unlawful activities of those engaged in organized crime." *Id.* (emphasis added). *See United States v. Turkette*, 452 U.S. 576, 586, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981) ("existing law, state and federal, was not adequate to address the problem" of organized crime).

Congress was aware that organized crime "quietly continues to infiltrate and corrupt organized labor." 116 Cong.Rec. 585 (1970) (statement of Senator McClellan). The purpose of the Organized Crime Control Act of 1970 was "to enable the Federal Government to address a large and seemingly neglected problem", which was "of national dimensions." *Turkette*, 452 U.S. at 586, 101 S.Ct. at 2530. "Trucking, construction, and *waterfront entrepre-*

*neurs* have been persuaded for labor peace to countenance gambling, loan-sharking and pilferage. As the takeover of organized crime cannot be tolerated in legitimate business, so, too, it cannot be tolerated here." S.Rep. No. 617, 91st Cong., 1st Sess. at 78 (emphasis added). Indeed, four of the specifically-enumerated predicate acts of racketeering activity defined under RICO are: embezzlement of employee plan funds, employee benefit plan kickbacks, illegal labor payoffs, and embezzlement of union funds. *See* 18 U.S.C. § 1961(1)(B), (C) (citing, respectively, 18 U.S.C. §§ 664, 1954; 29 U.S.C. §§ 186, 501(c)). These predicate acts occur only when labor is involved.

In RICO, congress adopted special tools to aid in the eradication of organized crime. First, it provided for liberal construction, in derogation of the general principle that penal statutes are to be strictly construed, *see* Reed Dickerson, *The Interpretation and Application of Statutes* 206, 210 (1975), in order "to effectuate [RICO's] remedial purposes." Organized Crime Control Act of 1970, Pub.L. 91–452, § 904(a), 84 Stat. 922, 947. Second, congress gave the district courts "*jurisdiction* to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders". 18 U.S.C. § 1964(a) (emphasis added). Third, it included a special provision for the attorney general to bring civil actions such as the civil RICO action underlying this case. *See* 18 U.S.C. § 1964(b). Once the district court acquires jurisdiction over the subject matter of, and the parties to, the litigation, "the All Writs Act [28 U.S.C. § 1651] authorizes a federal court to protect that jurisdiction". *United States v. International Bhd. of Teamsters*, 907 F.2d 277, 281 (2d Cir.1990).

■ We recognize that in all matters of statutory interpretation, we are ultimately looking for the intent of congress, *Farley v. Metro–North Commuter R.R.*, 865 F.2d 33, 33 (2d Cir.1989), and when we are interpreting seemingly-contradictory statutes, this task is especially sensitive. The question we must answer here is: When it enacted the Organized Crime Control Act

of 1970 in general, and RICO in particular, did congress intend that Norris–LaGuardia's 60–year–old, general prohibition against injunctions in "labor disputes" should bar relief of the type proposed in the case now before us? Our answer is "no".

■ We "are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). *See also Romano v. Luther*, 816 F.2d 832, 840 (2d Cir.1987). We must give both Norris–LaGuardia and RICO full effect, "if we can do so while preserving their sense and purpose." *Watt v. Alaska*, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). But if we cannot, we must resort to other principles of statutory elucidation. Fundamental among these principles is that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. at 550–51, 94 S.Ct. at 2483.

It is clear we cannot give full literal effect to both statutes. However, the labor-specific predicate racketeering acts specified in the RICO statute, the express grants of jurisdiction to district courts and of power to the attorney general in 18 U.S.C. § 1964, as well as legislative findings and history addressing the infiltration of labor unions by organized crime groups, all lead us to conclude that congress anticipated that RICO injunctions would extend to some "labor disputes". "Congress was well aware that it was entering a new domain of federal involvement through the enactment of [RICO]." *Turkette*, 452 U.S. at 586, 101 S.Ct. at 2530.

When an important federal policy would be "imperiled if equitable remedies were not available to implement it", the Norris–LaGuardia Act's "policy of nonintervention by the federal courts should yield to the successful implementation" of the impor-

tant federal policy. *Boys Markets,* 398 U.S. at 252, 90 S.Ct. at 1593. Granted, *Boys Markets* allowed an injunction in a "labor dispute" to accommodate policies *favoring* arbitration, *id.* at 252–53, 90 S.Ct. at 1593; but Norris–LaGuardia has also been read so as to "accommodate the competing demands of the [Railway Labor Act]", *see, e.g., Burlington Northern,* 481 U.S. at 445, 107 S.Ct. at 1851, as well as to accommodate § 301(a) of the Labor–Management Relations Act. *See, e.g., Local 2750, Lumber & Sawmill Workers Union v. Cole,* 663 F.2d 983, 987 (9th Cir.1981).

As a general rule, "[t]he prohibition of the [Norris–LaGuardia Act] must give way when necessary to enforce a duty imposed by another statute", *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 514, 109 S.Ct. 2584, 2598, 105 L.Ed.2d 415 (1989); so must the general prohibitions on equity jurisdiction contained in the Norris–LaGuardia Act give way to the more specific grant of such jurisdiction under RICO. More specifically, the Norris–LaGuardia anti-injunction provision must give way to the compelling governmental interest of eliminating the hold of organized crime on labor unions as contemplated by RICO. Enforcement of RICO's policies through the All Writs Act is, therefore, both necessary and proper, even when it results in an injunction against arbitrating the "labor dispute" between Local 1814 and NYSA.

A similar approach was taken by Judge Friendly in *Letter Carriers,* where he sought to reconcile the tensions between a literal reading of the Norris–LaGuardia Act and certain provisions of the subsequently-enacted Landrum–Griffin Act. He concluded that by reading "the Norris–LaGuardia Act as *pro tanto* amended by the recent trusteeship provisions [of the Landrum–Griffin Act], we ensure the viability of the latter enactment" and create only a limited intrusion on Norris–LaGuardia's broad prohibition against injunctions; to hold otherwise "would be to render the trusteeship scheme established by Congress in large measure nugatory." *Letter Carriers,* 449 F.2d at 919. *Accord Drywall Tapers & Painters v. Operative Plasterers' & Ce-*

*ment Masons Int'l,* 537 F.2d 669, 673–74 (2d Cir.1976). These views apply equally to the interplay between Norris–LaGuardia and RICO. Were we to hold other than we do, RICO's broadly-construed remedial powers would have virtually no vitality in a labor setting. By holding as we do, we give full effect to the specific mandates and policies of the RICO statute while making only a minor intrusion into Norris–LaGuardia's broad prohibition against injunctions in "labor disputes". Congress intended this result.

Moreover, our recent *Star Market* decision supports this conclusion. There, we noted that

collective bargaining agreements and [a RICO-grounded] Consent Decree address different problems and serve different purposes. The former governs the daily relations between particular employers and their employees, while the latter is an attempt to rebuild the infrastructure of an entire national labor organization [after eradicating the influence of organized crime].

*Star Market,* 954 F.2d at 810. *Star Market* stands for the proposition that, if presented with an attempted "RICO-reorganization" of a labor union, arbitrators (who have "narrowly circumscribed" professional skills) cannot properly consider the transcendent nature of the national public policy concerns presented by the dispute; thus, in those circumstances, the usual deference paid to an arbitration result does not attach. *Id.* at 809–10.

Even though we held in *Star Market* that an arbitration result would create no presumptions and would merit no deference by the district court, we nevertheless thought it prudent that the district court and the court-appointed officers should "remain free to complete their task unencumbered by collateral arbitration results." *Id.* at 810. The need for the broad remedies authorized by the RICO statute merits similar freedom.

Our holding today is narrow. We do not hold that "mere unlawfulness under any law is enough to remove the strictures of

the Norris–LaGuardia Act". *Order of R.R. Telegraphers v. Chicago & N.W. Ry. Co.,* 362 U.S. 330, 339 n. 15, 80 S.Ct. 761, 766 n. 15, 4 L.Ed.2d 774 (1960). We hold only that when injunctive relief in what would otherwise be a "labor dispute" is properly sought to further RICO's remedial purposes, the anti-injunction provisions of Norris–LaGuardia are inapplicable, and a federal court has jurisdiction to grant injunctive relief.

## CONCLUSION

The judgment of the district court is affirmed.