LOCAL 2750, LUMBER AND SAWMILL WORKERS UNION, AFL–CIO, Plaintiff-Appellant,

v.

Paul B. COLE, Elisabeth C. Butler, Spencer R. Collins, Martha B. Watts, Anna Rosborough, Ruth Cole Cainen, Louis Salmon, William Hubert Lindsey, Jr., d/b/a Rosboro Lumber Company, Defendants-Appellees.

No. 78–2251.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 1980.

Decided Dec. 14, 1981.

Bernard Jolles, Franklin, Bennett, Ofelt & Jolles, Portland, Or., for plaintiff-appellant.

Sherman B. Kellar, Portland, Or., for defendants-appellees.

Before BROWNING, Chief Judge, ANDERSON, Circuit Judge and BATTIN,* District Judge.

* Honorable James F. Battin, District Judge, United States District Court for the District of Montana, sitting by designation.

984

BROWNING, Chief Judge:

While the Rosboro Lumber Company was experiencing labor difficulties, bolts were discovered in the gear box of a large piece of equipment. Fearing employee sabotage, the company shut down its plant. The plant remained closed for nearly two months. The union filed this action under section 301(a) of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeking to enjoin the shutdown and to recover damages for lost wages. The union contends the shutdown was a "lockout" and was prohibited by the collective bargaining agreement unless the company first complied with the grievance adjustment procedures prescribed by the agreement.

Rosboro discharged a number of employees, apparently for alleged insubordination, malingering, and sabotage. The union filed a supplemental complaint, claiming the discharges were in breach of the contract because they were made without good cause and a statement of reasons. Shortly thereafter, Rosboro reopened the plant, employing the remaining employees.

The union now seeks only damages with respect to the shutdown since the union's prayer for injunctive relief was mooted by the reopening of the plant. The union seeks both damages and injunctive relief in the form of reinstatement on behalf of the wrongfully discharged employees.

After trial, the district court held the closure of the plant was not in breach of contract, that Rosboro had no obligation to initiate a grievance prior to the closure because the contractual grievance procedure was applicable only to employee grievances, and that Rosboro had bargained and acted in good faith as required by the contract and general federal labor law.

The court found one employee had been wrongfully terminated without good cause and awarded money damages. The court held the remedy of reinstatement barred by the anti-injunctive provision of the Clayton and Norris-LaGuardia Acts.

The union appeals the holdings that the closure was lawful and that the unlawfully discharged employee could not be reinstated.

■ The district court's resolution of the closure issue rests upon factual determinations. We find no clear error in the findings. We therefore affirm the district court's determination that Rosboro did not breach the collective bargaining agreement when it closed the plant.

■ The district court erred, however, in holding that "the equitable remedy of reinstatement is barred by the prohibitions of injunctions in labor disputes established by the Clayton Act (unless in aid of an agreement to arbitrate)."

Rosboro relies primarily upon the provision of section 4(a) of the Norris-LaGuardia Act that no federal court in any case involving or growing out of a labor dispute shall issue an injunction restraining any "person or persons participating or interested in such dispute ... from ... ceasing or refusing to perform any work *or to remain in any relation of employment.*" 29 U.S.C. § 104(a) (Rosboro's emphasis.)

Section 301(a) of LMRA, enacted after Norris-LaGuardia, confers jurisdiction upon the federal courts over suits for violation of contracts between employers and labor organizations. Section 301 of LMRA did not entirely displace in such litigation the restraints imposed upon the federal courts by the Norris-LaGuardia Act. Indeed, Congress expressly rejected a proposal to make section 4 of Norris-LaGuardia wholly inapplicable to suits under section 301 of LMRA for breach of collective bargaining agreements. *See Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 205–08, 82 S.Ct. 1328, 1334–35, 8 L.Ed.2d 440 (1962). On the other hand, section 4 of Norris-LaGuardia must be read in light of section 301 of LMRA and accommodated to the purposes of the later statute; section 4 does not bar injunctive relief in a section 301(a) suit in all circumstances that might be covered by the literal language of section 4. *Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970); *Textile Workers Union v. Lincoln Mills,* 353

U.S. 448, 458, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957).

Reinstatement has long been regarded as an appropriate equitable remedy for wrongful discharge in section 301(a) suits in this and other circuits (see *Tatum v. Frisco Transportation Co.*, 626 F.2d 55, 60 (8th Cir. 1980); *Soto Segarra v. Sea-Land Service, Inc.*, 581 F.2d 291, 297 (1st Cir. 1979); *Margetta v. Pam Pam Corp.*, 501 F.2d 179, 181 (9th Cir. 1974); *De Arroyo v. Sindicato de Trabajadores Packing*, 425 F.2d 281, 291–92 (1st Cir. 1970)), and the Supreme Court's recent decision in *Clayton v. International Union*, 451 U.S. 679, 688–93, 101 S.Ct. 2088, 2095–97, 68 L.Ed.2d 538 (1981), is based on the premise that reinstatement is available as a remedy in such suits.

Judge Coffin's opinion in *De Arroyo* expressly considered and rejected the contention that reinstatement is barred in section 301 suits by section 4(a) of the Norris-La-Guardia Act. This portion of the *De Arroyo* opinion is cited in *Tatum.*

Judge Coffin's interpretation of section 4(a) in *De Arroyo* rests upon several interrelated factors. First, Judge Coffin notes that to interpret section 4(a) as a bar against reinstatement of a wrongfully discharged employee, "completely disregards the primary purpose behind the anti-injunction provisions"; Congress's purpose was to protect workingmen in the exercise of organized economic power by ending the use of injunctions in labor disputes to upset the interplay of the competing forces of labor and capital, a purpose entirely unrelated to the use of reinstatement as a remedy for wrongful discharge. This assessment of the purpose of Congress is supported by section 2 of the Act, which spells out the policy of the Act in essentially the same terms, and commands the courts to apply that policy in the interpretation of the statute.[1] It is also consistent with prior Supreme Court pronouncements of the purpose of the Act.[2]

Judge Coffin points out that the legislative history indicates that section 4(a) was not intended "as a protection for employers," and that when employers were intended to be protected, as in section 4(b), they were specifically named. The same rationale justifying interpretation of section 4(a) as applicable only to injunctions against unions and employees and not against employers was employed in *Brotherhood of Locomotive Engineers v. Baltimore & Ohio R.R.*, 310 F.2d 513, 517–18 (7th Cir. 1963), sustaining the power to stay pending appeal

---

1. Section 2 of the Act reads:
    In the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are defined and limited in this chapter, the public policy of the United States is declared as follows:
    Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the *individual unorganized worker* is commonly helpless to exercise actual liberty of contract and *to protect his freedom of labor*, and *thereby to obtain acceptable terms and conditions of employment*, wherefore, though he should be free to decline to associate with his fellows, it is *necessary that he have full freedom of association, self-organization*, and *designation of representatives of his own choosing, to negotiate the terms and conditions of his employment*, and that *he shall be free from the interference, restraint, or coercion of employers* or labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.
    29 U.S.C. § 102 (1973) (emphasis added.)

2. *See also Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 251, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1960) ("Congress attempted to correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes *on the behalf of management*") (emphasis added); *Virginia Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 563, 57 S.Ct. 592, 607, 81 L.Ed. 789 (1937) (The evident purpose of the act was to "forbid blanket injunctions *against labor unions*" (emphasis added)). Note, *Accommodation of the Norris-La-Guardia Act to Other Federal Statutes*, 72 Harv.L.Rev. 354, 364–65 (1958) ("The act, interpreted in its historical context, seems *aimed only* at the traditional 'labor injunction'—typically an order which prohibits or restricts coercive conduct *of a union* in a labor dispute" (emphasis added)).

the implementation by an employer of changes in work rules.

Judge Coffin suggests that the "remains in any relation of employment" language of section 4(a) does not refer to any right of an employer not to continue the employment relationship, but was used to make clear that strikes could not be enjoined even when the strikers claimed to have completely ended the employment relationships, as well as when they claimed to have ceased work only temporarily.[3] The second clause of section 4(a) apparently originated in section 20 of the Clayton Act,[4] where it was clearly intended to apply to the termination of the work relationship by the employee rather than the employer.[5]

Finally, Judge Coffin concludes that section 4(a) should not be read to bar orders of reinstatement, because "the re-employment of improperly discharged employees can hardly be said to be one of the abuses sought to be eliminated by the Norris-La-Guardia Act." We followed similar reasoning in holding in *Retail Clerks Local 1222 v. Alfred M. Lewis, Inc.*, 327 F.2d 442 (9th Cir. 1964), that the Act did not deprive the district court of jurisdiction in a section 301 suit to issue a decree requiring an employer to make a cost-of-living adjustment required by a collective bargaining agreement, because such a decree was not "the kind of injunction contemplated by the Act." *Id.* at 446.

Section 4(a) was intended to protect the right of workers and labor unions to strike;[6] reinstatement is simply a remedy to make a wrongfully discharged employee whole. Measured against the broader purpose of the Act, reinstatement orders were not among the injunction devices employed to weaken labor and defeat its efforts to organize and bargain collectively; an order reinstating an employee discharged in violation of the collective bargaining agreement

3. *Local Union No. 861 v. Stone & Webster Eng'r Corp.*, 163 F.Supp. 894, 896 (W.D.La. 1958), reads the second clause of § 4(a) as protective of employers rather than employees. Neither argument nor authority is advanced to support this interpretation. *Stone & Webster* is cited in *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 429 n.15, 87 S.Ct. 559, 564 n.15, 17 L.Ed.2d 486 (1967), but not in support of *Stone & Webster's* interpretation of § 4(a). It is cited for the general proposition that § 7 of the Norris-LaGuardia Act might bar injunctive relief in § 301 suits. The questions the Supreme Court intended to raise is not clear; but in any event the question is only raised, not answered. Similarly, *Clune v. Publishers' Association*, 214 F.Supp. 520, 528 (S.D.N.Y.1963), *aff'd on opinion below* 314 F.2d 343 (2d Cir. 1963), only raises doubts as to whether injunctive relief can be obtained in a § 301 suit; it does not hold that it may not.

4. Section 20 of the Clayton Act was enacted to preclude the application of the Sherman Act antitrust provisions to the organizing activities of labor.

The Norris-LaGuardia Act was subsequently enacted "to obviate the results of the judicial construction of [the Clayton] Act," *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 562, 58 S.Ct. 703, 707, 82 L.Ed. 1012 (1938), which had effectively stripped labor of the protection contemplated by Congress.

The activities enumerated in § 4 of Norris-LaGuardia "are the same character of acts which Congress in Section 20 of the Clayton Act of October 15, 1914, sought to restrict from the operations of injunctions, . . . and this section is intended by more specific language to overcome the qualifying effects of the decisions of the courts in this respect." H.R.Rep.No.669, 72d Cong., 1st Sess. 7–8 (1932).

5. Section 20 of the earlier enacted Clayton Act, 29 U.S.C. § 52, provides in relevant part: "And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor . . ."

This language was specifically intended:
to guard the right of *workingmen* to act together in *terminating*, if *they* desire, *any relation of employment*, and to act together and in concert in doing or abstaining from any other of the acts named in that paragraph of the Section.

S.Rep. 698, 63d Cong., 2d Sess. 51 (1914) (emphasis added). *See* 51 Cong.Rec. 16321 (remarks of Rep. Floyd: "The bill prohibits a *corporation* from obtaining and the court from using injunctions to prohibit any person from *terminating any relation of employment* . . . [o]r from ceasing to perform work or labor" (emphasis added).)

6. *See* S.Rep.No.163, 72nd Cong., 1st Sess. 8–9, 16–18 (1932); H.R.Rep.No.669, 72d Cong., 1st Sess. 7–8 (1932). *See also* 75 Cong.Rec. 4629 (remarks of Sen. Blaine).

vindicates the agreement and strengthens the entities and processes that produced it.

Barring this remedy, on the other hand, would reduce the effectiveness of the federal courts in exercising the jurisdiction conferred by section 301(a) of LMRA enforcing labor contracts. Withholding the power of the court to issue adequate make-whole relief might discourage resolution by adjudication and increase the risk that the parties will resort to economic self-help—a result hardly conducive to "the encouragement of collective bargaining . . . for the peaceful resolution of industrial disputes." *Boys Markets, supra,* 398 U.S. at 251, 90 S.Ct. at 1593.

Other policy reasons favor according the federal courts power to order reinstatement. Since the Norris-LaGuardia Act is inapplicable to state courts, *Boys Markets, supra,* 398 U.S. at 247, 90 S.Ct. at 1590, and section 301(a) of LMRA does not divest state courts of jurisdiction over breach of contract suits between unions and employers, *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), interpreting section 4(a) to bar reinstatement in section 301(a) suits would create a significant disparity in the remedy available in state and federal forums. "[T]o the extent that widely disparate remedies theoretically remain available in state, as opposed to federal, courts, the federal policy of labor law uniformity . . . is seriously offended." *Boys Markets, supra,* 398 U.S. at 245–46, 90 S.Ct. at 1590.

Rosboro's contention that *Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) requires application of the anti-injunction bar of Norris-LaGuardia except in aid of an agreement to arbitrate, is without merit. *Buffalo Forge* did no more than limit the *Boys Market* exception to the anti-injunction bar of the Act. Both cases involve strikes by employees, conduct to which Section 4(a) of Norris-LaGuardia unquestionably applied absent some judicially created exception. The issue in this case is the threshold question of whether § 4(a) applies at all to an employer's refusal to reinstate a wrongfully discharged employee, and thus to the injunctive relief of reinstatement.

For the reasons discussed above, we conclude that section 4(a) of the Norris-LaGuardia Act does not bar an order of reinstatement in a section 301(a) action. Accordingly, neither do the less restrictive prohibitions of the Clayton Act. *California State Council of Carpenters v. Associated General Contractors,* 648 F.2d 527, 535 (9th Cir. 1980).

This does not dispose of the appeal. The district court also concluded that even if the court had power to reinstate the wrongfully discharged employee, it would not be appropriate to do so in this case because "damages will make [the discharged employee] whole for losses sustained up to the time he found other work." However, the court went on to deny the wrongfully discharged employee any damages for loss of seniority benefits, on the ground that the value of these benefits was too speculative. The court also failed to award damages for loss of four weeks' paid vacation.

Seniority rights admittedly have value. They provide an employee with protection against layoffs and increase the employee's opportunity for promotion to higher paying or more desirable jobs. It seems clear on the face of the record, therefore, that the damage award did not make the discharged employee whole. *See Richardson v. Communications Workers of America,* 443 F.2d 974, 985 (8th Cir. 1971). It was therefore improper to deny reinstatement on this ground.

The case is remanded to the district court to award damages for lost vacation pay, and to reconsider the propriety of reinstatement if the court concludes it is impossible to compensate the wrongfully discharged employee in damages for the loss of seniority rights. *Cf. Soto Segarra, supra,* 581 F.2d at 297.