BYE, Circuit Judge,
dissenting.
In 1914, after twenty years of judicial interference in labor conflicts on the side of the employers, Congress stepped in to protect organized labor by passing sections 6 and 20 of the Clayton Act. Section 20 of the Act generally prohibited the issuance of injunctions in cases involving or growing out of labor disputes. See 29 U.S.C. § 52. It soon became apparent, however, that what was supposed to be the “charter of liberty of labor,” Felix Frankfurter & Nathan Greene, The Labor Injunction 164 (1930) (remarks of William Howard Taft), fell short of the promise. The Lochner-era judges adopted a narrow interpretation of the Act, restricting it to “trade union activities directed against an employer by his own employees.” United States v. Hutcheson, 312 U.S. 219, 230, 61 S.Ct. 463, 85 L.Ed. 788 (1941). “[T]o protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act,” id. at 236, 61 S.Ct. 463, Congress passed the Norris-LaGuardia Act, under which “the allowable area of union activity was not to be restricted ... to an immediate employer-employee relation.” Id. at 231, 61 S.Ct. 463. Through its holding in this case today, the majority reaffirms the wisdom of the old French saying used by Felix Frankfurter and Nathan Greene when describing judicial reluctance to enforce § 20 of the Clayton Act: “the more things are legislatively changed, the more they remain the same judicially.” Felix Frankfurter & Nathan Greene, The Labor Injunction 176 (1930). Despite the repeated efforts of the legislative branch to come to the rescue of organized labor, today’s opinion puts the power of the Act in the service of employers, to be used against non-unionized employees who can no longer avail themselves of protections of labor laws. Because I cannot countenance such interpretation of the Act, I must and hereby dissent.
*683 I.
A. “Labor Dispute”
First, I have to disagree with the majority’s reading of the term “labor dispute.” As the majority recounts, “[t]he underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction.” United States v. Hutcheson, 312 U.S. at 235-36, 61 S.Ct. 463. The unequivocal goal of the new legislation was to overturn the Supreme Court’s decisions in Duplex Printing and Bedford Cut Stone, which had restricted § 20 of the Clayton Act to labor union activities directed against employees’ immediate employers. Allen Bradley Co. v. Local Union No. S, Int’l Bhd. of Elec. Workers, 325 U.S. 797, 805, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Congress accomplished the goal by clarifying that the term “labor dispute”
includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
29 U.S.C. § 113(c) (emphasis added).
However, in passing the NLGA, Congress never intended to change the well-accepted calculus of the Clayton Act as the legislation for the benefit of organized labor. The Clayton Act was always understood as an attempt to assist the organized labor movement at the time its progress was impeded by judicial misuse of injunctions. See, e.g., Hutcheson, 312 U.S. at 229-30, 61 S.Ct. 463 (explaining § 20 of the Clayton Act “withdrew from the general interdict of the Sherman Law specifically enumerated practices of labor unions by prohibiting injunctions against them”); Bedford Cut Stone Co. v. Journeymen Stone Cutters’ Ass’n of N. Am., 274 U.S. 37, 56, 47 S.Ct. 522, 71 L.Ed. 916 (1927) (separate opinion by Stone, J.) (describing the Clayton Act as being concerned with “organized labor”); Am. Steel Foundries v. Tri-City Cent. Trades Council, 257 U.S. 184, 208-09, 42 S.Ct. 72, 66 L.Ed. 189 (1921) (“Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects.”); see also Frankfurter & Green, The Labor Injunction, at 130-31, 139 (describing the Clayton Act’s preoccupation with organized labor). It is this well-entrenched understanding of the term “labor dispute” as centered on the struggle between employers and organized labor that informs interpretation of the same definition under the NLGA. See Bruesewitz v. Wyeth LLC, — U.S.-, 131 S.Ct. 1068, 1082, 179 L.Ed.2d 1 (2011) (“When ‘all (or nearly all) of the’ relevant judicial decisions have given a term or concept a consistent judicial gloss, we presume Congress intended the term or concept to have that meaning when it incorporated it into a later-enacted statute.”) (citation omitted).
Like the Clayton Act, the NLGA has been consistently cited in connection with protection of unions’ rights. See Brown v. Pro Football, Inc., 518 U.S. 231, 253 n. 2, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (dubbing §§ 6 and 20 of the Clayton Act and the NLGA as the “organized labor’s exemption from federal antitrust laws”); Jacksonville Bulk Terminals, Inc. v. Int’l Longshoremen’s Ass’n, 457 U.S. 702, 726, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982) (elaborating on the plain meaning of § 13(a) of the NLGA and noting the Act protects “union organizational efforts and efforts to improve working conditions”); H.A. Artists & Assoc., Inc. v. Actors’ Equity Ass’n, 451 U.S. 704, 717 n. 20, 101 S.Ct. *684 2102, 68 L.Ed.2d 558 (1981) (“Of course, a party seeking refuge in the statutory exemption must be a bona fide labor organization .... ”); Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 621-22, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) (stating the Clayton Act and the NLGA “declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities” from their purview); Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 772, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (“The Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C. §§ 101-115, expresses a basic policy against the injunction of activities of labor unions.”); Hutcheson, 312 U.S. at 231, 61 S.Ct. 463 (the NLGA “established that the allowable area of union activity was not to be restricted, as it had been in the Duplex case, to an immediate employer-employee relation”). This interpretation is in part dictated by § 2 of the Act, which “explicitly formulated the ‘public policy of the United States’ in regard to the industrial conflict.” Hutcheson, 312 U.S. at 231, 61 S.Ct. 463. Such public policy expressed concern with the plight of the “individual unorganized worker,” whom Congress deemed “helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment” when confronted with “corporate and other forms of ownership association” assumed by employers. 29 U.S.C. § 102. Commenting on the judicial respect § 2 deserves, the Supreme Court explained that “[tjhere are few pieces of legislation where the congressional hearings, committee reports, and the language in the legislation itself more clearly point to the necessity for giving an Act a construction that will protect the congressional policy the Act adopted.” See Order of R.R. Telegraphers v. Chicago & N.W. R.R. Co., 362 U.S. 330, 335, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). In the NLGA’s case, the congressional policy was about helping the unions.
The majority attempts to diminish the significance of § 2’s emphasis on organized labor by drawing attention to the part of the section which declares that an “individual unorganized worker” shall be free from the interference of employers in “self-organization or other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” The majority finds it significant that the National Labor Relations Act, which guarantees employees the right to “self-organization ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,” 29 U.S.C. § 157, has been interpreted not to require the presence of the union. NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); Mohave Elec. Co-op., Inc. v. NLRB, 206 F.3d 1183, 1189 & n. 6 (D.C.Cir.2000). While the definitions of the term “labor dispute” in the NLGA and NLRA, it is true, overlap, “the extent of the prohibition against injunctive relief contained in Norris-LaGuardia [is] not coextensive with the National Labor Relations Act and the Board’s jurisdiction over unfair labor practices.” First Nat’l Maint. Corp. v. NLRB, 452 U.S. 666, 686 n. 23, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). To give one example of the differences between the two statutes, the NLGA’s injunction immunity is limited to labor disputes involving parties in “the same industry, trade, craft, or occupation,” 29 U.S.C. § 113(a)-(b), whereas the NLRA does not have a similar limitation, see 29 U.S.C. § 152(9). And while the NLGA covers strikes about political issues which are beyond the scope of the immediate employment relationship, Jacksonville Bulk Terminals, Inc., 457 U.S. at 710-15, 102 S.Ct. 2672, the NLRA does not, Int’l Longshoremen’s Ass’n v. Allied Int’l, Inc., 456 U.S. 212, 225-26, 102 S.Ct. *685 1656, 72 L.Ed.2d 21 (1982). Most critically, unlike the NLRA, the NLGA does not expressly protect concerted employee activities.
The phrase “mutual aid or protection” in § 2 of the NLGA had a “heuristic purpose” — i.e., to inform the courts of the “considerations moving Congressional action.” Richard Michael Fischl, Self, Other, and Section 7: Mutualism and Protected Protest Activities Under the National Labor Relations Act, 89 Colum. L. Rev. 789, 847 (1989) (quoting Frankfurter & Greene, The Labor Injunction, at 212). The phrase most likely originated from the “ideology of mutualism, rooted in working-class bondings and struggles,” as contrasted with the philosophy of individualism embraced by “the prosperous and well-born.” Id. at 851(quoting D. Montgomery, The Fall of the House of Labor 2, 171 (1987)). The judicial gloss put on the terms “concerted activity” and “mutual aid and protection” years later, in the context of a different statute, cannot be used to undermine the Act’s express concern with the success of the organized labor movement.
The majority also overstates by attributing too much significance to the Supreme Court’s decision in New Negro Alliance, where the NLGA was applied in the context of a picket by an association of African Americans who, having been largely excluded from membership in the established unions, adopted the “traditional tactics of organized labor.” Kenneth W. Mack, Rethinking Civil Rights Lawyering and Politics in the Era Before Brown, 115 Yale L. J. 256, 319 (2005). Such reliance on Neiu Negro Alliance is unjustified. The decision presented a different question of whether the association had to have the employment relationship with the employer and whether the racial struggle underlying the dispute was antithetical to finding a “labor dispute” within the meaning of the NLGA. Prior to the Supreme Court’s decision, various circuits had apparently disagreed on the answers, and the lower courts’ rulings held the NLGA inapplicable on these grounds. While setting the courts on the correct path with respect to the questions raised, the Court did not discuss whether a union was a sine qua non to the NLGA’s applicability. In addition, in subsequent decisions the Court clarified, “a party seeking refuge in the statutory exemption [from antitrust liability] must be a bona fide labor organization, and not an independent contractor or entrepreneur.” H.A. Artists & Associates, Inc., 451 U.S. at 717 n. 20, 101 S.Ct. 2102 (emphasis added). The Eighth Circuit agreed the absence of concerted labor activities disqualifies the subjects of the injunction from protection under the NLGA. Ozark Air Lines, Inc. v. Nat’l Mediation Bd., 797 F.2d 557, 563 (8th Cir.1986) (stating a concerted activity is at the heart of the NLGA, which does not apply to the case because, among other things, it “has nothing to do with ... concerted labor activities”). Even if New Negro Alliance could leave the impression that a union is not required for the NLGA to apply, the Supreme Court’s subsequent insistence on the NLGA’s beneficiary status as a bona fide labor organization exposes such impression as being false.
This is not surprising. Organized labor activity serves as the necessary limiting principle circumscribing the application of the NLGA. Without such limiting principle, the Act would tie the courts’ hands in granting injunctive relief in many routine cases where parties seek to enforce various aspects of individual employment contracts. Because courts have never viewed the NLGA as an obstacle to such exercise of equity powers, see, e.g., N.I.S. Corp. v. Swindle, 724 F.2d 707 (8th Cir.1984) (upholding the grant of a preliminary injunction enforcing a covenant not to compete), *686 the reading of the term untethered to unionization and collective bargaining activity does not make sense-.
B. “Involving or Growing Out”
Second, I must take issue with the majority’s conclusion as to this case not representing the outer boundary of the phrase “involving or growing out of a labor dispute.” Like the nonstatutory labor exemption, statutory exemption from antitrust liability, which rests in part on the Norris-LaGuardia Act, Connell Construction Co., 421 U.S. at 621-22, 95 S.Ct. 1830, lies at the intersection between labor and antitrust laws. Allen Bradley Co., 325 U.S. at 806, 65 S.Ct. 1533 (elaborating on the responsibility to reconcile “two declared congressional policies” — one “seeking] to preserve a competitive business economy” and one seeking “to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining”); Am. Steel Erectors, Inc. v. Local Union No. 7, Int’l Ass’n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 76 (1st Cir.2008) (stating that both the statutory and the nonstatutory labor exemption were developed “[t]o balance the competing federal policies supporting organized labor on one hand and business competition on the other”); Mackey v. NFL, 543 F.2d 606, 613 (8th Cir.1976) (availability of the labor exemption “turns upon whether the relevant federal labor policy is deserving of preeminence over federal antitrust policy under the circumstances of the particular case”). “While the Norris-LaGuardia Act’s bar of federal-court labor injunctions is not explicitly phrased as an exemption from the antitrust laws, it has been interpreted broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes.” H.A. Artists & Associates, Inc., 451 U.S. at 714, 101 S.Ct. 2102. The scope of the two exemptions differs somewhat — -“the statutory exemption allows unions to accomplish some restraints by acting unilaterally, [whereas] the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market,” see Connell Construction Co., 421 U.S. at 622, 95 S.Ct. 1830,— but there is no place for the application of either at the time labor laws no longer govern and labor policy is no longer implicated.
The Supreme Court recognized as much when it explained that nonstatutory immunity from antitrust review is no longer necessary when “an agreement among employers [is] sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process.” Brown, 518 U.S. at 250, 116 S.Ct. 2116. As an example of such endpoint, the Court cited “collapse of the collective-bargaining relationship, as evidenced by decertification of the union.” Id. (quoting Brown v. Pro Football, Inc., 50 F.3d 1041, 1057 (D.C.Cir.1995)). With the players having voted to end the NFLPA’s status as their collective bargaining representative and the NFLPA likewise having disclaimed its status as the players’ representative, this case has reached that endpoint. See Brady v. NFL, 640 F.3d 785, 798-99 (8th Cir.2011) (Bye, J., dissenting) (elaborating on the reasons why the union disclaimer should end the protection against antitrust liability).
Indeed, the League itself anticipated dissolution of antitrust remedy fetters upon disclaimer of union representation, as is evident from its concessions in previous cases. See Powell v. NFL, 930 F.2d 1293, 1303 n. 12 (8th Cir.1989) (describing the League’s concession that “the Sherman Act could be found applicable, depending *687 on the circumstances, ... if the affected employees ceased to be represented by a certified union”); see also Appellees Special Add. at 370 (transcript of the League’s Supreme Court argument in Brown v. Pro Football, Inc., where the League conceded antitrust immunities would not apply when “employees ultimately elect, in good faith, ... to give up their rights under the labor laws”). The League’s view was consistent with those of the courts, who saw disassociation from the union as the point beyond which labor laws yield to the antitrust regime. Brown, 50 F.3d at 1057 (“If employees wish to seek the protections of the Sherman Act, they may forego unionization or even decertify their unions. We note that the NFL players took exactly this latter step after the Eighth Circuit’s Powell decision.”); Powell, 930 F.2d at 1305 (Heaney, J., dissenting) (criticizing the majority opinion for continuing the labor exemption for too long — in effect, “until the bargaining relationship is terminated either by a NLRB decertification proceeding or by abandonment of bargaining rights by the union”). This realization as to the players’ membership in a union acting as a shield against the possibility of antitrust charges is the reason why, in the 1993 White settlement, the League insisted the NFLPA be reconstituted as the players’ representative and the collective bargaining relationship between the parties be reestablished.
At some point in the “arising out of’ spectrum, the antitrust immunities stemming from statutory and nonstatutory labor exemptions must come to an end and give way to antitrust remedies. Such point does not come a year from the union disclaimer, nor one business cycle from it, as suggested by the League’s counsel. Rather, such point comes at the moment of the union disclaimer.
II.
Although I would conclude the district court correctly determined this case does not involve or grow out of a labor dispute, thus negating any further application of the NLGA, I am compelled to write further addressing the majority’s conclusion as to § 4(a) of the NLGA protecting employers. At least three other circuit courts have reached the opposite conclusion and, for the reasons set forth below, I find their reading persuasive. In interpreting § 4(a), these courts were guided by the legislative history of the NLGA, as well as the legislative history of the Clayton Act — from which the NLGA was drawn — both of which indicate the NLGA was not intended to protect employers. Finally, the stated purpose in § 2 of the NLGA confirms the statute should be interpreted in such a manner as to protect employees, rather than employers.
I start from where the majority began its analysis, with a review of the pertinent cases discussing whether § 4(a) prohibits injunctions against employers. In de Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281, 291 (1st Cir.1970), the First Circuit concluded § 4(a) does not protect employers, albeit in the context of whether the remedy of reinstatement in a case under § 301 of the Labor Management Relations Act was barred by the NLGA. de Arroyo rejected a strictly literal interpretation of § 4(a) because such a reading “completely disregards the primary purpose behind the anti-injunction provisions, ‘to protect working men in the exercise of organized, economic power ... to correct existing abuses of the injunctive remedy in labor disputes ... to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital.’ ” Id. at 290-91 (quoting Bhd. of R.R. Trainmen v. Chicago R. & I.R. Co., 353 *688 U.S. 30, 40-41, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)). The court also referenced the legislative history behind § 4(a), which indicated the provision “was not intended as a protection for employers.” Id. at 291. Instead, the court reasoned, “[t]he ‘remain in any relation of employment’ language ... was used ... simply to make clear that employee strikes could not be enjoined either if the employees claimed to have ceased or refused to work temporarily or if they claimed to have completely ended their employment relation with their employer.” Id.
De Arroyo was in line with a case decided by the Seventh Circuit eight years earlier, Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co., 310 F.2d 513, 517 (7th Cir.1962), which conducted “a thorough examination of the Act and its pertinent legislative history.” According to the Seventh Circuit, “our study of that history and the language of the Act ... convinces us that the purpose of Congress in this respect was to protect only employees and unions.” Id. at 518. The court continued, “[w]e find nothing in the statement of policy to indicate any intention to deny jurisdiction to issue injunctions against employers,” save for the same exceptions referenced by De Arroyo. Id. In sum, the Seventh Circuit deferred to Congress’s authority:
The enactment of the Act, was, of course, the responsibility of Congress, and not that of this court. That Congress may have been intent upon shielding organizations of employees from injunctions rather than employers was and is a matter within its province. The same can be said of the exemption of labor organizations from the sanctions of antitrust laws. Those are matters over which the courts have no control, in the absence of a constitutional attack.
The language used clearly negatives any intention to recognize any general reciprocity of rights of capital and labor. Essentially the Act is frankly a charter of the rights of labor against capital.
Id. Given the language and history of § 4, the Seventh Circuit concluded the NLGA did not prevent the issuance of an injunction. Id.
Building upon the decisions of the First and Seventh Circuits, the Ninth Circuit issued perhaps the most comprehensive decision on the issue in Local 2750, Lumber & Sawmill Workers Union v. Cole, 663 F.2d 983 (9th Cir.1981). Although Lumber & Sawmill Workers again involved § 301 of the LMRA, the court discussed at length the application of § 4(a). Id. at 985-987. Specifically, the court agreed with de Arroyo because “section 4(a) does not refer to any right of an employer not to continue the employment relationship, but was used to make clear that strikes could not be enjoined even when the strikers claimed to have completely ended the employment relationships, as well as when they claimed to have ceased work only temporarily.” Id. at 986. To further support this assertion, the court noted, “[t]he second clause of section 4(a) apparently originated in section 20 of the Clayton Act, where it was clearly intended to apply to the termination of the work relationship by the employee rather than the employer.” Id. Ultimately, after considering the text and history of § 4(a), as well as the history of the Clayton Act, the Ninth Circuit concluded “[sjection 4(a) was intended to protect the right of workers and labor unions to strike,” and thus the reinstatement order under § 301 was not barred by the NLGA. Id. at 986-87; see also Retail Clerks Union Local 1222, AFL-CIO v. Alfred M. Lewis, Inc., 327 F.2d 442, 446 (9th Cir.1964) (“While the writer of this opinion agrees with the view expressed by the 7th Circuit ... that the purpose of Norris-LaGuardia was to protect only employees and unions, except for two isolated exceptions appearing in section 3(a, b), and *689 in section 4(b), it is not necessary for us in this case to go so far.”) (internal citations omitted).
While the majority acknowledges each of the above decisions, it criticizes the courts’ reasoning at the outset by focusing on one of the underlying aspects contained therein “that when employers were intended to be protected, as in section 4(b), they were specifically named.” Lumber & Sawmill Workers, 663 F.2d at 985. Citing to Local Union No. 881, United Rubber, Cork, Linoleum, & Plastic Workers v. Bridgestone/Firestone, Inc., 61 F.3d 1347, 1352, 1355 (8th Cir.1995), the majority concludes, “[t]his court already has recognized that § 4(c) applies to injunctions against employers ... so the premise of de Arroyo and Lumber & Sawmill Workers that employers are protected against injunction under § 4 only when specifically mentioned in § 4(b) is a non-starter under circuit precedent.” Ante at 675; see also id. at 676 n.5 (distinguishing the Seventh Circuit’s decision due to “this court’s precedent that § 4 applies to injunctions against employers”).
With due respect to the majority, Bridgestone/Firestone did not so hold. Bñdgestone/Firestone revolved around an injunction issued in favor of a union against an employer under an exception to the NLGA provided in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), which applies “ ‘if the strike is over a dispute which under the parties’ collective bargaining agreement should be submitted to arbitration.’” 61 F.3d at 1352 (quoting John Morrell & Co. v. Local Union SOkA, 804 F.2d 457, 459 (8th Cir.1986)). Within this context, the court was tasked with determining “whether the Boys Markets exception applies ... where the union has sought and obtained an injunction against the company,” which was “an issue of first impression in this circuit.” Id. Following the lead of three circuits which had “unanimously concluded that the Boys Markets rationale should be extended to allow for injunctions against employers,” the court likewise held the exception applied equally to employers. Id. The court then went on to analyze whether the Boys Markets test was satisfied, answering such question in the negative because the union “failed to demonstrate that without the injunction the arbitration proceeding would be frustrated or rendered a nullity.” Id.
A careful reading of Bñdgestone/Firestone reveals it has no bearing on the present question of whether § 4(a) protects employers. Namely, whether the Boys Markets exception applies to employers and employees alike is an entirely different question than whether § 4(c), much less § 4(a), touches even-handedly on employers and employees. See, e.g., Aeronautical Indus. Dist. Lodge 91 of Int’l Ass’n of Machinists & Aerospace Workers v. United Techs. Corp., 230 F.3d 569, 581 (2d Cir.2000) (distinguishing Niagara Hooker Emp. Union v. Occidental Chem. Corp., 935 F.2d 1370 (2d Cir.1991), which Bñdgestone/Firestone relied on, because “Niagara HookePs focus was not all conceivable labor disputes, but only those concerning arbitrable issues,” and thus the reverse Boys Markets exception was “wholly inapplicable to a case, like this one, in which the labor dispute concerns nonarbitrable issues”). In sum, while it is true Bñdgestone/Firestone ultimately overturned an injunction against the employer, see id. at 1355, the court made no inquiry whatsoever as to whether § 4 itself protects employers equally, notwithstanding the Boys Markets exception, and therefore Bñdgestone/Firestone does not contain any recognition or precedent applying § 4(c) to employers. Correspondingly, Bñdgestone/Firestone is not in conflict with the three circuit cases discussed *690 above which bear directly on the question at hand.
Even if Bridgestone/Firestone stands for the proposition asserted by the majority, I respectfully disagree with the majority’s subsequent statutory interpretation. The majority rejects the Players’ argument distinguishing between temporary and permanent work stoppages in the first and second clauses of § 4(a). Instead, advancing the broad scope of the term “any,” the majority construes “[rjefusing to ... remain in any relation of employment” to encompass non-permanent work stoppages “such as a strike or lockout of employees.” Ante at 677. However, the majority rejects the NFL’s counterpart argument that “the second clause should be understood as applying only to employers.” Id. at 677 (emphasis in original). In doing so, the majority concedes its interpretation is asymmetrical because “[ejmployees may refuse to perform work under the first clause, and they may refuse to remain in a relation of employment under the second.” Id.
I have considerable doubt about the majority’s interpretation of § 4(a). First, there is little basis in the text for reading § 4(a) as referring only to employees under the first clause but to both employees and employers under the second clause. Moreover, the breadth with which the majority interprets the second clause as it relates to employers ostensibly covers the employee conduct encompassed under the majority’s reading of the first clause. Stated differently, under the majority’s remarkably broad interpretation, a refusal to perform any work by employees would be tantamount to a refusal to remain in any relation of employment because “it changes the condition or character of that relationship” in some fashion. Ante at 676. Such an interpretation, which conflates the two clauses, cannot stand because it renders the first clause superfluous. See Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 609 (8th Cir.2011) (“We avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress.”) (internal quotation marks and citation omitted).
Second, and perhaps more importantly, the majority’s interpretation fails to give effect to Congress’s intent in passing the NLGA. See Ortega-Marroquin v. Holder, 640 F.3d 814, 818 (8th Cir.2011) (noting courts must give effect to the intent of Congress when clear); see also Boys Markets, Inc., 398 U.S. at 250, 90 S.Ct. 1583 (“Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions.”). Returning to the legislative history discussed in depth above, which bears some repetition in the context of § 4, the NLGA “was enacted in response to federal-court intervention on behalf of employers,” which “had caused the federal judiciary to fall into disrepute among large segments of this Nation’s population.” Jacksonville Bulk Terminals, Inc., 457 U.S. at 715, 102 S.Ct. 2672; see also id. at 716, 102 S.Ct. 2672 (“The legislative history is replete with criticisms of the ability of powerful employers to use federal judges as ‘strike-breaking’ agencies”).
Attempting to remedy this inequity, the House Committee on the Judiciary explained about the NLGA, “[t]he purpose of the bill is to protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act ..., which act, by reason of its construction and application by the Federal courts is ineffectual to accomplish the congressional intent.” H.R.Rep. No. 669, 72d Cong., 1st Sess. 3 (1932). According to the Commit *691 tee, because federal courts were in the pocket of employers, the restrictions contained in § 20 of the Clayton Act had “ ‘become more or less valueless to labor, and this section is intended by more specific language to overcome the qualifying effects of the decisions of the courts in this respect.’ ” Milk Wagon Drivers’ Union v. Lake Valley Farm Prods., Inc., 311 U.S. 91, 102, 61 S.Ct. 122, 85 L.Ed. 63 (1940) (quoting H.Rep. No. 669, pp. 7, 8). Reviewing these committee reports, the Supreme Court concluded, “[w]hether or not one agrees with the committees that the cited cases constituted an unduly restricted interpretation of the Clayton Act, one must agree that the committees and the Congress made abundantly clear their intention that what they regarded as the misinterpretation of the Clayton Act should not be repeated in the construction of the Norris-LaGuardia Act.” Id. at 103, 61 S.Ct. 122. Indeed, even the League concedes this much. See Blue Br. at 27 (“There is no doubt that concerns about injunctions against labor unions, rather than injunctions against employers, were the principal catalyst for the bill.”).
Then-Professor Frankfurter, a drafter of the NLGA, wrote § 4 “provides that in cases growing out of labor disputes, no persons participating in, or affected by, such disputes shall be enjoined from striking, or from striking for the success of strikes, by customary labor union effort, short of fraud or violence.” Felix Frankfurter & Nathan Greene, The Labor Injunction 215 (1930). Professor Frankfurter explained § 4 was “a paraphrase of like language in the Clayton Act which was held to be merely declaratory of the modern common law right to strike.” Id. at 217-18; see generally Carcieri v. Salazar, 555 U.S. 379, 129 S.Ct. 1058, 1065 n. 5, 172 L.Ed.2d 791 (2009) (noting the author of the legislation was “an unusually persuasive source as to the meaning of the relevant statutory language”). Eleven years later, then Supreme Court Justice Frankfurter confirmed this principle on the Supreme Court:
The relation of the Norris-LaGuardia Act to the Clayton Act is not that of a tightly drawn amendment to a technically phrased tax provision. The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction. This was authoritatively stated by the House Committee on the Judiciary.
Hutcheson, 312 U.S. at 235-36, 61 S.Ct. 463.
As an assist in the interpretation of § 4(a), it is therefore helpful to look to § 20 of the Clayton Act, which prohibits injunctions against “terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do.” 29 U.S.C. § 52. The Supreme Court construed this language as forbidding injunctions against “recommending, advising or persuading others by peaceful means to cease employment and labor.” Am. Steel Foundries, 257 U.S. at 203, 42 S.Ct. 72. The Court continued, “[i]t is clear that Congress wished to forbid the use by the federal courts of their equity arm to prevent peaceable persuasion by employees, discharged or expectant, in promotion of their side of the dispute.” Id.
Delving deeper into the Clayton Act, the legislative history behind the “terminating any relation of employment” clause further confirms Congress intended to protect only employees. See Lumber & Sawmill Workers, 663 F.2d at 986 (“The second clause of section 4(a) apparently originated in section 20 of the Clayton Act, where it was clearly intended to apply to the termi *692 nation of the work relationship by the employee rather than the employer.”). The House Committee acknowledged, “[t]he consensus of judicial view ... is that workingmen may lawfully combine to further their material interests without limit or constraint, and may for that purpose adopt any means or methods which are lawful. It is the enjoyment and exercise of that right and none other that this bill forbids the courts to interfere with.” H.R.Rep. No. 63-627, at 32 (1914). The Senate Committee likewise stated the language was intended “to guard the right of workingmen to act together in terminating, if they desire, any relation of employment, and to act together and in concert in doing or abstaining from doing any other of the acts named in that paragraph of the Section.” Lumber & Sawmill Workers, 663 F.2d at 986 n. 5 (quoting S.Rep. No. 63-698, at 51 (1914)).
Finally, if the legislative history left any lingering doubt about whether § 4(a) protects employers, Congress conclusively resolved any ambiguity by building the purpose into the NLGA itself via § 2. “Specifically, the Congress found that prevailing socio-political and economic conditions prevented individual workers from obtaining ‘acceptable terms and conditions of employment’ ” and thus the NLGA “sought to ensure workers the right to organize and conduct union activities ‘free from the interference, restraint, or coercion’ of employers or their agents by means of labor injunctions.” Burlington N. R.R. Co. v. United Transp. Union, 848 F.2d 856, 861 (8th Cir.1988) (citing 29 U.S.C. § 102). Senator Norris made clear § 2 was to be utilized as a guide to judicial interpretation which would “ ‘relieve ... many of the difficulties which have heretofore existed when a court has been called upon to interpret the law’— obviously thinking of the Supreme Court’s interpretation of the Clayton Act.” James M. Altman, Antitrust: A New, Tool for Organized Labor?, 131 U. Pa. L. Rev. 127, 151 (1982) (quoting 75 Cong. Rec. 4503 (1932)).
In response to the policy statement offered by Senator Norris, Senator Hebert, the author of the Senate Judiciary Committee’s minority report, proposed language to § 2 to protect “both the employer and the employee.” Id. at 152 (quoting 75 Cong. Rec. 4677 (1932)). Senator Hebert disclosed his substitute “ ‘trie[d] to afford the same degree of consideration to the employer in his relations to his employees as it does to the employee in his relations with his employer’ ” because the majority bill contained “‘very little, if any, reference to the consideration that is to be given to the employer in his relations with his employee.’ ” Id. (quoting 75 Cong. Rec. 4678). Following a colloquy, Senator Hebert’s substitute “was defeated soundly.” Id. (noting the vote was 47 to 18). “That vote ... makes it quite clear that in passing the Norris-LaGuardia Act Congress had no intent to relieve employers of any liability under the antitrust laws.” Id. at 153. Even if Congress had such intent, “the scope of such an exemption would be narrowly limited by the terms of the Act.” Id. at 154 (“[T]he only subsection in section 4 that refers to an employer’s activities is 4(b)”).
Although the majority attempts to minimize the congressional defeat of employer protections in the NLGA, there can be little doubt this legislative history provides yet more support for a reading of § 4(a) which protects only employees. See, e.g., United States v. United Steelworkers of Am., 271 F.2d 676, 683 (3d Cir.1959) (“Our conclusion in this regard is confirmed, we think, by contrasting the statute as enacted with the House proposal which was rejected.”). Indeed, the Supreme Court has previously placed significant weight on similar legislative history when construing *693 the NLGA, as well as other labor statutes. See, e.g., Burlington N. R.R Co. v. Bhd. of Maint. of Way Emps., 481 U.S. 429, 439-440, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (“After lengthy debate, punctuated with numerous references to the notorious Pullman Strike of 1894, the House refused an amendment proposed by Representative Beck that would have exempted railroads from the coverage of the Act. The historical background of the Norris-LaGuardia Act thus reveals that Congress intended to preclude courts from enjoining secondary as well as primary activity, and that the railroads were to be treated no differently from other industries in this regard.”) (citation omitted); Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 412-416, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981) (“The legislative debates and the process of legislative amendment demonstrate that Congress deliberately chose” not to include a provision defeated in the House bill regarding section 301 of the Labor Management Relations Act).
Viewing the legislative history of § 4(a) in its entirety, Congress did not intend to protect employers under the provision. See de Arroyo, 425 F.2d at 291 (“Our understanding of the legislative history behind section 4(a) leads us to conclude that that section was not intended as a protection for employers.”). Moreover, the purpose delineated in § 2 further bolsters this conclusion. See Baseball Players and the Antitrust Laws, 53 Colum. L. Rev. 242, 249 n.71 (1953) (“Given the purpose of the Norris-LaGuardia Act it is improbable that an association of employers which deprives an ‘individual unorganized worker’ of his ‘freedom of labor’ comes within its protection.”). Interpreting the text of § 4(a) in light of the legislative history and express policy of the NLGA, I would conclude § 4(a) does not protect employers.
In the end, I find illustrative the wise words of Judge Learned Hand:
Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.
Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.1945). In this case, “the fact remains that Congress passed the Norris-LaGuardia Act to forestall judicial attempts to narrow labor’s statutory protection.” Bhd. of Maint. of Way Emps., 481 U.S. at 443, 107 S.Ct. 1841. This is exactly what the majority has done. As a consequence, I am compelled to and must dissent.[9]

. Although the majority confines its analysis to the NLGA, I remain strongly convinced the other traditional injunction factors favor the Players. See Minn. Citizens Concerned for Life, Inc. v. Swanson, 640 F.3d 304, 310 (8th Cir.2011) (setting forth the factors a court must consider). For the reasons set forth in my prior dissent, see Brady v. NFL, 640 F.3d 785, 794-96 (8th Cir.2011) (Bye, J., dissenting), which have only intensified given the current juncture, I would affirm the district court.